IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ROBERT DOUGLAS
SLAUGHTER,

                                    Plaintiff,

        v.                                                    1:03-cv-3410-WSD

SHEET METAL WORKERS'
LOCAL NO. 85 PENSION PLAN,

                                    Defendant.

## ORDER

This is an action in which Plaintiff Robert Slaughter ("Plaintiff") seeks

retirement pension benefits under an employer benefit plan governed by the

Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001

et seq.  It is before the Court on Defendant Sheet Metal Workers' Local No. 85

Pension Plan's ("Defendant") Second Motion for Summary Judgment ("II Def.

MSJ") [44], Plaintiff's Second Motion for Summary Judgment ("II Pl. MSJ") [45],

and Plaintiff's Motion to Reopen Discovery [46].

## I.      FACTUAL BACKGROUND

In 1969, Plaintiff began his career in the sheet metal industry as an

apprentice with Sheet Metal Workers Local No. 85 (the "Union").  Twenty-two

years later, in 1991, Plaintiff founded Air Data, Inc. ("Air Data").  Air Data performs HVAC test and balance work for mechanical contractors who install heating and air conditioning systems.  This work involves testing air flow and water flow in commercial heating and air conditioning systems, making adjustments to such flow, and reporting this data to HVAC mechanical contractors. Testing and balancing work is included within the definition of sheet metal work in the Union's Collective Bargaining Agreement ("CBA").

Until 1994, Air Data was a "one-man business" run by Plaintiff in which he was Air Data's sole test and balance field technician.  In 1994, Air Data expanded its business by hiring other field technicians.  As Air Data grew, Plaintiff reduced his own field technician activities and increasingly devoted his time to corporate administrative responsibilities.  As of January 2003, Plaintiff no longer worked "in the field" as a test and balance field technician.

Plaintiff is a participant in the Union's Pension Plan (the "Plan"), a multiemployer pension plan covered by ERISA.  The Plan provides that the Plan Administrator, defined as "the Trustees," have "full discretionary authority to determine eligibility for Plan benefits, to construe the terms of the Plan, and to control the operation and administration of the Plan."  (Sheet Metal Workers'

Local 85 Pension Plan ("Plan"), attached to II Def. MSJ [44] as Ex. C, Part 1, at §§ 2.34, 8.7(b).)  At all relevant times, Southern Benefits Administrators ("Southern Benefits") acted as the third-party administrator for the Plan.

Participants are eligible for benefits under the Plan if they cease "Sheet Metal Employment" either on or after the Normal Retirement date -- their sixty-fifth birthday.  (Plan, Part 1, at §§ 2.27, 5.1.)  The Plan elsewhere defines "Sheet Metal Employment" as "performance by the Participant of work regularly performed by sheet metal workers, even if such work is performed in the Participant's capacity as the owner of a sole proprietorship or a partner in a partnership . . . ."  (Id. at § 2.40.)[1]  The Plan also provides for early retirement in some limited circumstances, including the "Rule of 85," which states that a participant may be eligible for benefits before the age of 65 if the sum of his age and his years of service with the Union equals at least 85.  (Id. at § 5.2.)

In April 1999, Plaintiff wrote to Linda Gilbert ("Gilbert"), Southern Benefits' Atlanta branch manager, to determine when his age and years of service would qualify him for early retirement under the Plan's "Rule of 85."  Plaintiff also

---

[1]  The Plan's definition of Sheet Metal Employment also includes territorial restrictions not at issue in this litigation.

asked Gilbert to clarify the Plan's post-retirement employment limitations. Plaintiff stated that "since the day to day administrative duties of running [Air Data] prevent me from actually working in the field, I would like to retire from technician duties under the 85 rule, draw my pension, and continue to operate my company in an administrative capacity only." (April 9, 1999 letter from Plaintiff to Gilbert, attached to Pl. First MSJ [26] as Ex. 2, at 1.) Plaintiff interpreted the Plan to prohibit retirees from "physically work[ing] in the sheet metal industry." Because he had no intention of performing the duties of a field technician after he retired, he believed he was not precluded from collecting his pension. (Id.)

Gilbert responded to Plaintiff's letter in June 1999. She informed him that, on the basis of his work record, he "could become eligible for the Rule of 85 retirement provision at least by June l, 2001, possibly earlier." (June 21, 1999 letter from Gilbert to Plaintiff, attached to Pl. First MSJ as Ex. 5, at 1.) As to the meaning of the Plan's post-retirement employment limitations, Gilbert stated that Plaintiff's continued operation of Air Data would constitute Sheet Metal Employment under the Plan. (Id. at 1-2.)

On November 6, 2002, Plaintiff submitted a formal request for his early retirement benefits, relying on the distinction he made between his duties in managing Air Data and the duties of a test and balance technician:

> [M]y company activities can no longer be described as "Sheet Metal Employment", as defined in the [Plan]. . . . My present and future duties are to approve, sign and certify NEBB reports, oversee bookkeeping activities, generate and sign checks for day-to-day operation of the company, including payroll checks, and decide on insurance and legal matters as they relate to the well being of the company and accounts receivables.  None of these items are "work regularly performed by sheet metal workers . . . ."

(November 6, 2002 letter from Plaintiff to Marshall, attached to Pl. First MSJ as Ex. 6, at 1.)  Gilbert denied Plaintiff's application in her letter dated January 7, 2003.[2]  In her letter, Gilbert explained that "under our interpretations of [the Plan] you would not qualify for a retirement benefit from the Pension Fund while remaining active in the operations of your company, Air Data."  (January 7, 2003 letter from Gilbert to Plaintiff, attached to Pl. First MSJ. as Ex. 8, at 1.)  She informed Plaintiff that his letter would be considered as an appeal to the Trustees

---

[2]  Although Plaintiff's November 6, 2002 letter was addressed to James Marshall ("Marshall"), the business manager for the Union and a Plan Trustee, Gilbert was copied on the letter. As third-party administrator for the Plan, Gilbert responded to the letter.

and would be submitted to the Trustees at their next regularly scheduled meeting on February 14, 2003.  (Id.)  She also advised Plaintiff he could submit a letter specifically to the Trustees for their consideration, and she would present these materials to the Trustees.  (Id.)  On January 15, 2003, Plaintiff submitted an additional letter for the Trustees' consideration.  Plaintiff's letter reiterated his argument that the administrative tasks he performs as the head of Air Data "are not tasks 'regularly performed by sheet metal workers' . . . ."  (January 15, 2003 letter from Plaintiff to Gilbert, attached to Pl. First MSJ as Ex. 9, at 2.)

The Trustees convened on February 14, 2003, and concluded that Plaintiff's appeal should be denied.  The minutes of the meeting state that "[a]fter giving careful consideration to [Plaintiff's] letter and additional supporting documentation, the Trustees determined that he was indeed continuing to perform Sheet Metal Employment . . . ."  (Minutes of Trustees' February 14, 2003 Meeting, attached to Pl. First MSJ as Ex.10, at 2.)  This decision "was based upon their interpretation of the plan's definition of Sheet Metal Employment [which includes] work regularly performed by Sheet Metal Workers, even if such work was performed as the owner of a sole proprietorship or a partner in a partnership."  (Id.)  Plaintiff was notified of the Trustees' decision by John Brassell ("Brassell"), Plan

Administrator, by letter dated February 18, 2003.  Brassell informed Plaintiff that,

"[i]n the opinion of the trustees, the plan's definition of Sheet Metal Employment,

which . . .  includes work regularly performed by Sheet Metal Workers, even if

such work is performed as the owner of a sole proprietorship or a partner in a

partnership, encompasses anyone in that situation who is continuing to operate a

sole proprietorship or a partnership."  (February 18, 2003 letter from Brassell to

Plaintiff, attached to Pl. First MSJ as Ex. 11, at 1.)

On November 10, 2003, Plaintiff filed this action against Defendant,

alleging an improper denial of pension benefits under ERISA.  (Compl. [1].)  On

September 23, 2005, after motions for summary judgment were filed by both

Plaintiff and Defendant, this Court denied both motions.  (Order Denying Motions

for Summary Judgment [42].)  The Court found that Defendant did not clearly

articulate its interpretation of the Plan in the administrative record or in its

submissions to the Court.  Because it was unclear what facts were known to the

Trustees at the time of their decision, the Court ordered Defendant to reconvene

and determine again whether Plaintiff is entitled to receive early retirement benefits

under the terms of the Plan.  In its Order, the Court required the Defendant, in its

written decision, to: 1) list the Plan provisions believed to be implicated by

Plaintiff's claim; 2) articulate its interpretation of the relevant provisions in detail sufficient for Plaintiff and the Court to understand the interpretation and the grounds upon which the interpretation is based; 3) identify the facts relied on in reaching the decision to deny Plaintiff's request for benefits, and; 4) explain how these facts support the decision.  (Id. at 19.)  On October 27, 2005, the Trustees called a meeting wherein Plaintiff presented his appeal for early retirement benefits.  On November 10, 2005, the Trustees issued a written decision, again denying Plaintiff's request for early retirement.  (Decision by Board of Trustees, attached to II Pl. MSJ [45] as Ex. A.)

In their written decision, the Trustees found that the activities performed by Plaintiff on and after January 2, 2003, the date that Plaintiff attempted to retire, constitute "work regularly performed by sheet metal workers."  Specifically, they found that Plaintiff continued to perform the "last critical step" of testing and balancing work.  Plaintiff's activities affecting the Trustees' decision include reviewing technical specifications reported by his technicians, requesting retesting when needed in order to certify readings, and communicating with engineers regarding specifications related to the readings.  They noted that Plaintiff performed this final step both before and after his asserted retirement date, and that

8

the certification work he performs builds upon his skills gained as a sheet metal worker.  Because testing and balancing work was found by the Trustees to be "work regularly performed by sheet metal workers," they held that Plaintiff was ineligible to receive early retirement benefits because he had not ceased sheet metal employment as required by the Plan.  (Id. at 4.)  On December 16, 2005, both parties filed their second cross motions for summary judgment.

## II.    DISCUSSION

Defendant moves for summary judgment, arguing that based on the evidence within the administrative record as well as the applicable law, the decision to deny Plaintiff benefits under the Plan was not *de novo* wrong, and even if it was, the decision to deny was based on reasonable grounds and should be affirmed.  That is, under the arbitrary and capricious standard of review, Torres v. Pittston Co., 346 F.3d 1324, 1329 (11th Cir. 2003), Defendant's interpretation is at least reasonable, is in the best interest of the Fund and its participants, and is consistent with the interpretation and application used to deny Plaintiff's previous requests for early retirement.  (See II Def. MSJ, at 12.)

Plaintiff opposes Defendant's motion, and has filed a cross-motion for summary judgment.  He argues that Defendant confuses the work of a sheet metal

worker with the work of a supervisor.  Plaintiff argues that the Trustees' denial of

Plaintiff's pension is both *de novo* wrong, and under the arbitrary and capricious

standard of review, unreasonable, and should not be affirmed.  Plaintiff argues that

his interpretation of the Plan is reasonable, he should receive his early retirement

benefits, and summary judgment should be granted in his favor.[3]  (See II Pl. MSJ,

at 3.)

### A.    Standard of Review

When evaluating a plan administrator's or fiduciary's decision to deny

benefits under a plan governed by ERISA, the Court first must determine the

applicable standard of review.  The Supreme Court has established three distinct

standards: (1) *de novo* where the plan does not grant the administrator discretion;

(2) arbitrary and capricious where the plan grants the administrator discretion; and

(3) heightened arbitrary and capricious where the plan grants the administrator

---

[3]  Because the parties both rely on a common administrative record and the same background facts in their arguments, the Court addresses both motions for summary judgment in the same discussion.  The parties do not dispute any material facts, but merely disagree over the interpretation of the Plan and its proper application to Plaintiff's ability to receive retirement benefits.  The Court's task here is to evaluate the administrative record before it using the arbitrary and capricious standard of review and determine whether the Trustees' decision to deny Plaintiff benefits should be affirmed.

discretion, but the administrator operates under a conflict of interest.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir. 2004).

The parties here agree that the Plan grants the Trustees discretion in making eligibility determinations, no conflict of interest exists, and the traditional "arbitrary and capricious" standard of review therefore applies.  (II Def. MSJ, at 12, 14; II Pl. MSJ, at 4.)  "In determining whether the denial of the [plan participant's] claims was arbitrary and capricious, 'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'"  Dyce v. Salaried Employees' Pension Plan of Allied Corp., 15 F.3d 163, 166 (11th Cir. 1994) (citing Jett v. Blue Cross & Blue Shield of Ala., 890 F.2d 1137, 1139 (11th Cir. 1989)).  This standard of review, which the Eleventh Circuit has characterized as "substantively the same as the 'abuse of discretion' standard," is designed to "avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny)" to benefits determinations.  Williams, 373 F.3d at 1137; HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 994 (11th Cir. 2001) ("We cannot over emphasize the importance of the

11

discretion afforded a claims administrator; the underlying premise of arbitrary and capricious, rather than *de novo*, review is that a court defers to the discretion afforded the claims administrator . . . .").  The standard applies to both the plan administrator's interpretation of plan terms and its factual determinations.  Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1450-52 (11th Cir. 1997) (noting the Eleventh Circuit's consistent application of the abuse of discretion standard of review to both factual findings and plan interpretation and applying this arbitrary and capricious standard of review to a plan administrator's factual findings); Torres, 346 F.3d at 1329.

Review under the arbitrary and capricious standard has two steps.  First, the Court must determine whether, under the *de novo* standard of review, Defendant's benefits denial decision is "wrong," (*i.e.*, the court disagrees with the administrator's decision).  Williams, 373 F.3d at 1138.  If not, then the court's inquiry ends and the decision is affirmed.  Id.  If the administrator's decision is *de novo* wrong, then the court proceeds to the second step and evaluates whether reasonable grounds supported the decision (hence, reviews the administrator's decision under the deferential arbitrary and capricious standard).  Id.  If the

decision is supported by reasonable grounds, then the court's inquiry ends and the decision is affirmed.[4]  Id.  If not, the decision is reversed.  Id.

**B.**   ***De Novo* Review**

The Court considers first whether the Defendant's interpretation of the Plan here was "wrong."  See HCA, 240 F.3d at 994 n.23.  "'Wrong' is the label used by [the Eleventh Circuit] to describe the conclusion a court reaches when, after reviewing the plan documents and disputed terms *de novo*, the court disagrees with the claims administrator's plan interpretation."  Id.  Whether Defendant's interpretation of the Plan was wrong is a very close question which was well-argued by the Plaintiff and the Defendant.  Having carefully considered the Plan terms and the administrative record generally under the applicable arbitrary and capricious standard, this Court finds that the Defendant's decision to deny benefits was not *de novo* wrong.

In its written decision, the Trustees identified the relevant provisions of the Plan:

---

[4] "If the court determines that the administrator's interpretation is reasonable, then this wrong but reasonable interpretation is entitled to deference even though the claimant's interpretation is also reasonable."  HCA, 240 F.3d at 994.

5.2 <u>Early Retirement</u>.  A participant shall be eligible for a Pension if he ceases *Sheet Metal Employment* before his Normal Retirement Date but on or after a date described in Subsection (a), (b), or (c) below:

(b) <u>Rule of 85</u>.  The first date as of which the sum of the Participant's age and either (i) his years of Vesting Service or (ii) his years of Credited Service equals at least eight-five [sic] (85) years.

(Decision by Board of Trustees, attached to II Pl. MSJ as Ex. A, at 2.)  "Sheet Metal Employment," as defined in the Plan, is:

2.40 <u>Sheet Metal Employment</u>. *With respect to a Participant, performance by the Participant of work regularly performed by sheet metal workers*, even if such work is performed in the Participant's capacity as the owner of a sole proprietorship or a partner in a partnership. . . .

14

(<u>Id.</u>)  The Plan is available to employees of employers[5] who have adopted the

Collective Bargaining Agreement.  The Trustees found that the CBA provides:

> **Section 1**.  This Agreement covers the rates of pay and
> conditions of employment of all employees of the
> Employer engaged in, but not limited to, . . . (c) testing
> and balancing of all air-handling equipment and duct
> work; . . . and (f) all other work included in the
> jurisdictional claims of Sheet Metal Workers'
> International Association.

(<u>Id.</u> at 3.)

The Trustees identified the principal issue in this case to be:  "whether

[Plaintiff's] duties and activities as an employee of Air Data, Inc. on and after

January 2, 2003 are of the type that trigger ineligibility under Section 5.2 of the

Plan because it is 'Sheet Metal Employment.'"  (<u>Id.</u> at 4.)  Because the Sheet Metal

---

[5]  Plaintiff here qualifies as an employee under the Plan.  "Employee" is
defined under the Plan as:

> an individual on whose behalf an Employer makes or is
> required to make Contributions to the Fund, except (a)
> the owner of a sole proprietorship or a partner in a
> partnership if such sole proprietorship or partnership is
> the Employer that has the obligation to make
> contributions to the Fund. . .

(Decision by Board of Trustees, attached to II Pl. MSJ as Ex. A, at 2-3.)  Air Data,
Inc. is a Georgia corporation and contributes to the Plan on behalf of Plaintiff as an
employee.

Workers' CBA covers employees engaged in testing and balancing of all air-handling equipment and duct work, the Trustees interpreted this provision along with the Plan and concluded that the definition of "work regularly performed by sheet metal workers" includes testing and balancing work.  The Trustees concluded that Plaintiff has continued to perform testing and balancing work since January 2, 2003, and that this work constitutes "work regularly performed by sheet metal workers."  (Id.)  Because Plaintiff continues to do this work, Defendant determined that Plaintiff has not ceased Sheet Metal Employment as required by the Plan, and therefore may not take early retirement.

The Trustees noted in reaching this decision that Plaintiff admitted during the claims process that he has engaged in the following tasks:

> verifying the quality, accuracy, and layout of all testing and balancing (T&B") reports; overseeing the flow of reports through the office, as well as signing and stamping the reports; and corresponding with engineers regarding changes to their specifications.

(Id.)  The Trustees found that these tasks amounted to Plaintiff performing testing and balancing work.  They reasoned that while Plaintiff may not have been in the field collecting data, he was involved substantively and integrally in the testing and balancing process, albeit contributing later in the process to insure testing was done

16

correctly, directing it be done again if necessary, and communicating with engineers regarding structural changes to be made for certification.  In reaching these findings, the Trustees compared Plaintiff's work now with the work sheet metal workers regularly perform.  While testing and balancing is only a part of "work regularly performed by sheet metal workers," it is in fact sheet metal work, and Plaintiff was substantially and substantively engaged in this segment of it.

The Trustees also found Plaintiff's current work to be consistent with the work he performed before his attempted retirement.  (Id. at 5.)  The continuity of his work duties before and after his asserted retirement date supported their conclusion that these activities fall under "work regularly performed by sheet metal workers."  (Id.)  The Trustees noted that Plaintiff has been reviewing T&B reports since 1994 and has continued to perform these reviews after January 2, 2003.  The Trustees also noted that Plaintiff is a certified TAB supervisor, and in order to obtain this certification, one must "demonstrate knowledge of Testing, Adjusting and Balancing of air and hydronic systems. . . ."  (Id. at 4.)  The Trustees found that Plaintiff was therefore building on his prior knowledge of testing and balancing work in performing his current duties.  The Trustees found that these activities are the "critical last step" in the process of testing and balancing air

handling equipment and duct work.  They concluded that Plaintiff's role is "not just ministerial with respect to his review of the field reports (i.e., he simply re-types the reports) but rather it is substantive."  (Id.)  These activities performed by Plaintiff further supported their conclusion that Plaintiff was engaged in "work regularly performed by sheet metal workers" after his retirement.  (Id.)

After considering the administrative record and reading the relevant contract provisions, the Court cannot conclude that the Defendant's interpretation of the Plan and resulting decision to deny Plaintiff early retirement benefits is wrong. Especially convincing is the Trustees' determination that Plaintiff was performing an important and integral step in testing and balancing work–certifying the results and reviewing the reports–both before his retirement and after.  If he was performing this work while still a covered employee doing "work regularly performed by sheet metal workers" before his attempted retirement on January 2, 2003, and no other person was performing the certification duties, then this work can legitimately be considered "work regularly performed by sheet metal workers," and Plaintiff has not ceased doing this work as required to receive his pension benefits.

The Court agrees that Plaintiff does not simply process paperwork, but performs substantive work integral to testing and balancing–reviewing technical specifications reported to him by his technicians, requesting retesting when needed in order to certify readings, and communicating with engineers regarding specifications related to the readings.  (Transcript of Hearing Re: Robert Douglas Slaughter, attached to Decision of Board of Trustees as Ex. A, at 40:9-42:1; January 15, 2003 letter from Plaintiff to Gilbert, attached to Pl. First MSJ as Ex. 9.)[6]  Plaintiff's distinction between field work versus office work is not recognized in the Plan, and therefore is not determinative.[7]  Rather, whether Plaintiff is

---

[6]  The Court finds it noteworthy that when Plaintiff first described his post-retirement activities in the November 6, 2002 letter, he neglected to fully describe his involvement in the testing and balancing process, stating only the ministerial part of his duties.  (See November 6, 2002 letter from Plaintiff to Marshall, attached to Pl. First MSJ as Ex. 6, at 1.)

[7]  Plaintiff cites NLRB v. Kentucky River Community Care, 532 U.S. 706 (2001), in his effort to distinguish the work of workers and the work of those who manage and supervise them.  (II Pl. MSJ, at 16.)  Plaintiff argues that the supervisors play a different role than mere workers "in the field," and that it is incorrect to include supervisors like Plaintiff in the definition of "work regularly performed by sheet metal workers."  (Id.)  Kentucky River involves the Supreme Court's interpretation of the National Labor Relations Act, and has nothing to do with the interpretation of a Plan and CBA involving a participant like Plaintiff, the Union, and the Plan Administrator.  The distinctions discussed by the Supreme Court in Kentucky River are therefore not controlling, and the Trustees were free to come to the conclusion they did in interpreting the Plan.  Besides, the record

performing "work regularly performed by sheet metal workers" is determinative. That Plaintiff is not working "in the field" does not mean that he is not performing testing and balancing work.  He still performs a substantive and critical role in the testing and balancing process–tasks he also performed before his attempted retirement.  Defendant's decision that Plaintiff's activities constitute "work regularly performed by sheet metal workers" under the Plan, and that he is ineligible to retire, was not wrong.

### C.    Reasonableness of the Defendant's Decision

Even if the Defendant's decision to deny benefits was *de novo* wrong, Defendant's decision to deny benefits was not, on the administrative record here, arbitrary and capricious.  "In determining whether the denial of the [plan participant's] claims was arbitrary and capricious, 'the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made.'" <u>Dyce v. Salaried Employees' Pension Plan of Allied Corp.</u>, 15 F.3d 163, 166 (11th Cir. 1994) (citing <u>Jett v. Blue Cross & Blue Shield of Ala.</u>, 890 F.2d 1137, 1139 (11th

---

upon which the Trustees relied shows Plaintiff engaged in testing and balancing activities that involve more than simply supervising others.

Cir. 1989)); see also Cagle v. Bruner, 112 F.3d 1510, 1518 (11th Cir. 1997)

("Under the arbitrary and capricious standard of review, [the court is] limited to

deciding whether the [plan administrator's] interpretation of the plan was made

rationally and in good faith.").  "It is irrelevant that the court or anyone else might

reach a different conclusion."  Turner v. Delta Family-Care Disability &

Survivorship Plan, 291 F.3d 1270, 1274 (11th Cir. 2002).  This standard of review,

which the Eleventh Circuit has characterized as "substantively the same as the

'abuse of discretion' standard," is designed to "avoid judicial second

guessing/intrusion by according the most judicial deference (and thus, the least

judicial scrutiny)" to benefits determinations.  Williams, 373 F.3d at 1137.

    The Eleventh Circuit has elaborated on this standard by setting forth several

factors to be considered in making this determination. They include the

reasonableness of the interpretation; the uniformity of the Fund's construction, and

possible concerns with the way unexpected costs may affect the future financial

health of the Fund.  Cagle, 112 F.3d at 1518.  Other factors that may be relevant

are the internal consistency of a plan, the relevant regulations formulated by

administrative agencies, and the factual background of the determination, including

any inferences of bad faith.  Id. at n.6.

Fundamentally, there must be a reasonable basis for Defendant's decision in this case.  Plaintiff reviews technical specifications reported by technicians**,** calls for retesting in order to obtain certifiable readings, corresponds with engineers about specifications related to these readings, and reviews and certifies test results. These tasks can reasonably be considered part of the process of testing and balancing work, and testing and balancing work is sheet metal employment under the CBA.  The Trustees were also reasonable in basing their decision on the fact that Plaintiff's duties build on and are a continuation of the work he was previously doing as a sheet metal worker.  The fact that Plaintiff engaged in these post-retirement activities before he retired was a further reasonable basis for the Trustee's decision.  It was therefore reasonable to conclude that Plaintiff did not cease performing sheet metal work when he retired.

Plaintiff argues that he spent his days "in the field" prior to his attempted retirement, physically performing measurements and readings in addition to certifying and reviewing the results, while he now performs mostly administrative work on top of reviewing and certifying the testing and balancing work that is performed by his field technicians.  Though he has delegated the field work to others, he does more than manage them.  Indeed, the administrative record,

22

including Plaintiff's testimony, establishes his ongoing, substantive and important role in the testing and balancing process, albeit not in the field.  His duties, when viewed in their totality, were reasonably determined by the Trustees to be work which constitutes "work regularly performed by sheet metal workers."

The Trustees also uniformly construed the terms of the Plan in reviewing Plaintiff's request for early retirement benefits.  In fact, their interpretation is consistent with their explanation of the term "work regularly performed by sheet metal workers" that was published in a 1996 newsletter Ms. Gilbert sent to Plaintiff in April 2000 that Plaintiff read and understood.  (See Newsletter, attached to II Def. MSJ as Ex. A, at Ex. 9; April 13, 2000 letter from Gilbert to Plaintiff, attached to II Def. MSJ as Ex. A, at Ex. 19; Slaughter Depo., attached to Filing of Exhibits to Def. First MSJ [28] as Ex. A, at 30:9-31:2.)  The newsletter explains that sheet metal employment "can include work for a sheet metal contractor in another capacity if [one uses] skills acquired as a sheet metal worker."  (Id. at Ex. 9.)  The Court  finds no evidence in the record that the Trustees' interpretation of this definition has not been uniform and consistent.  The third factor, the concerns with the way unexpected costs may affect the future financial health of the Fund, also supports the finding that Defendant's interpretation was reasonable.  Section 5.2 of

the Plan demonstrates the Trustees' motivation to preserve Fund assets by not

paying benefits to a participant who is still performing union work.

Other factors mentioned by the <u>Cagle</u> court also are relevant here.  In finding

the decision reasonable, the Court also finds the Trustees' decision internally

consistent.  All relevant portions of the Plan and CBA are considered by the

Trustees in the written decision, and reasonable interpretations as to their meaning

were consistently applied.  The Trustees properly interpreted the CBA to define the

work regularly performed by sheet metal workers, and the conclusion they reach is

a reasonable one.  Finally, the Court finds no bad faith on the part of Defendant.

The decision is well-reasoned and complies with the Court's September 23, 2005,

order.  There is no evidence that the Trustees relied on anything other than the facts

before them that are included in the administrative record.  The Trustees' decision

was reasonable under the arbitrary and capricious standard of review.[8]

_____

[8] Plaintiff cites <u>Central Laborers's Pension Fund v. Heinz</u>, 541 U.S. 739
(2004), for the proposition that the Trustees are unlawfully diminishing Plaintiff's
protected opportunities and expectations in the Plan, and that <u>Heinz</u> "reaffirm[ed]
ERISA's protection of pensioners' rights to be secure in their expected benefits."
(II Pl. MSJ, at 12.)  That case does not help Plaintiff's argument.  <u>Heinz</u> is
inapplicable because it construes the impact of an amendment under the
requirements of ERISA's anti-cutback prohibition.  Here, Defendant did not amend
Plaintiff's Plan, but simply interpreted the provisions of the Plan in a way that is
not satisfactory to Plaintiff.  This does not make the Trustees' interpretation

The Court's responsibility here is to provide a high degree of judicial deference to the benefits determination and to avoid judicial second guessing and intrusion into the Trustees' determination.  The Court finds that Defendant's decision was not wrong and was reasonable under the arbitrary and capricious standard.  Defendants' motion for summary judgment on this claim is therefore GRANTED, and Plaintiff's motion for summary judgment is therefore DENIED.[9]

_____

unreasonable.

     [9]  Both parties request an award of attorneys' fees in this case.  (See II Def. MSJ, at 22; Pl. Opp. to II Def. MSJ [51], at 23; Amended Compl. [4].)  Section 502(g)(1) of ERISA provides that a court may, in its discretion, award attorneys' fees and costs in a benefits claim.  29 U.S.C. § 1132(g).  The five factors to be considered in determining whether to award fees in a benefits action are: 1) the degree of the opposing parties' culpability and bad faith; 2) the ability of the opposing party to satisfy an award of attorneys' fees; 3) whether an award of attorneys' fees against the opposing party would deter other persons acting under similar circumstances; 4) whether the party requesting attorneys' fees seeks to benefit all participants of an ERISA plan or to resolve a significant question regarding ERISA; and 5) the relevant merits of the parties' positions.  Freeman v. Continental Ins. Co., 996 F.2d 1116, 1119 (11th Cir. 1993) (citing Iron Workers Local # 272 v. Bowen, 624 F.2d 1255, 1266 (5th Cir. 1980)).  The Court finds that attorneys' fees are not appropriate in this case.  Although the Defendant is the prevailing party, the Court does not find any bad faith or strong culpability on the part of Plaintiff in seeking early retirement under the Plan.  Indeed, the legal and factual issues here were legitimate ones to litigate.  The Court does not conclude that awarding fees would deter others from seeking benefits under similar circumstances, nor is there a strong indication that other participants will benefit from Defendant's litigation of this matter.  Considering the "relevant merits of the parties' positions," the Court does not find Plaintiff's arguments to have been

### D.  Plaintiff's Motion to Reopen Discovery

Plaintiff seeks to reopen discovery concerning alleged new facts which Plaintiff claims arose after the filing of the Court's order denying summary judgment and to compel the Defendant to reveal what the Plaintiff claims is a concealed administrative record.  (Pl. Mot. to Reopen Disc.[46], at 1.)  Plaintiff claims that on the day he was scheduled to appear for his hearing before the Trustees, the Trustees spent approximately 50 minutes discussing the case with their lawyers, causing the hearing to start 50 minutes late.  (Id. at 2.)  Plaintiff submits the affidavit of one of Air Data's employees, Ted Davis, who claims that he received a telephone call from Randy Beall, a friend of Mr. Davis and a Trustee of Defendant, immediately before the start of the hearing.  (Id. at 3.)  Mr. Beall allegedly asked Mr. Davis many questions about Plaintiff's role in Air Data's daily operations, and told Mr. Davis that the pension board had already discussed Plaintiff's case at length and that it had already decided Plaintiff would not be allowed to retire.  (Id. at 4.)  Mr. Beall allegedly told Mr. Davis that if Plaintiff were allowed to retire, many other management and supervisory personnel will do

---

brought in bad faith or with no justifiable basis.  Both Plaintiff and Defendant's requests for attorneys' fees are **DENIED**.

the same thing, and that the Board had counted 20-25 names of other persons who would be eligible to retire if Plaintiff were allowed.  (Id.)  Plaintiff argues that discovery should be reopened because he should be allowed to know all facts relied upon by Defendant and known at the time of making its decision, and the Court should have a complete administrative record before it.  (Id. at 5.)

A motion to reopen discovery is "properly denied where a significant amount of discovery has already been obtained and further discovery would not be helpful."  Artistic Entm't, Inc. v. City of Warner Robins, 331 F.3d 1196, 1202 (11th Cir. 2003).  The Court finds that reopening discovery in this case would not be helpful here.  As Defendant points out, Plaintiff had the opportunity to conduct discovery regarding other Plan participants who were similarly situated to Plaintiff and was aware of their existence.  Second, the content of the conversation between Mr. Beall and Mr. Davis, even if it was considered by the Trustees, simply reflects and supports the facts and determinations cited by Defendant in its written decision denying benefits to Plaintiff.  There is nothing new about the information contained in the affidavit submitted by the Plaintiff.  The factual and legal determinations made by Defendant in this case are both correct and reasonable. The administrative record amply supports Defendant's determination, and

additional discovery into conversations and other information, where there is no

indication it was materially different than the information the Trustees considered,

would only unnecessarily delay the case and would not otherwise be helpful.

Plaintiff's motion to reopen discovery is therefore **DENIED**.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Second Motion for Summary

Judgment [44] is **GRANTED**.  Plaintiff's Second Motion for Summary Judgment

[45] is **DENIED**.  Plaintiff's Motion to Reopen Discovery [46] is **DENIED**.

**SO ORDERED** this 23rd day of June, 2006.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE